Affirmed and Opinion filed July 7,
2011.

 

In
The

Fourteenth
Court of Appeals



NO. 14-09-00756-CR



Katherine
Michelle Nadal, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 208th District Court

Harris County, Texas

Trial Court
Cause No. 1224903



 

OPINION 

Appellant, Katherine Michelle Nadal, appeals from her
conviction for causing serious bodily injury to a child.  She raises seven
issues on appeal, contending:  (1) the evidence is legally insufficient to
sustain the verdict, (2) the evidence is factually insufficient to sustain the
verdict, (3) the evidence is legally insufficient to sustain the jury’s finding
that she used a deadly weapon in commission of the offense, (4) the trial court
erred in admitting certain photographs into evidence, (5) the prosecution
engaged in a pattern of misconduct throughout the trial, (6) the trial court
erred in admitting certain hearsay testimony, and (7) she received ineffective
assistance of counsel.  We affirm.

 

Background

            On March 13,
2007, a five-month-old male child was mutilated by having his genitals and
tissue from his upper left leg removed.  Appellant, the child’s mother, was
arrested and charged with causing serious bodily injury to a child.  A jury
subsequently found her guilty, found that she used a deadly weapon in
committing the offense, and assessed her punishment at ninety-nine years in
prison and a $10,000 fine.

Injury to a Child

            In her first two
issues, appellant contends that the evidence is legally and factually
insufficient to sustain the jury’s verdict finding her guilty of injury to a
child.  While this appeal was pending, a majority of the Court of Criminal
Appeals agreed that only one standard should be used to evaluate the
sufficiency of the evidence in a criminal case:  legal sufficiency.  Brooks
v. State, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality opinion); id.
at 926 (Cochran, J., concurring).  Accordingly, we review the sufficiency of
the evidence in this case under a rigorous and proper application of the Jackson
v. Virginia, 443 U.S. 307 (1979), legal sufficiency standard.  Brooks,
323 S.W.3d at 906; Pomier v. State, 326 S.W.3d 373, 378 (Tex.
App.—Houston [14th Dist.] 2010, no pet.).

When reviewing the sufficiency of the evidence, we
view all of the evidence in the light most favorable to the verdict to
determine whether a rational jury could find the essential elements of the
crime beyond a reasonable doubt.  Isassi v. State, 330 S.W.3d 633, 638
(Tex. Crim. App. 2010); Williams v. State, 235 S.W.3d 742, 750 (Tex.
Crim. App. 2007).  This court does not sit as a thirteenth juror and may not
substitute its judgment for that of the fact finder by re-evaluating the weight
and credibility of the evidence.  Isassi, 330 S.W.3d at 638; Williams,
235 S.W.3d at 750.  Instead, we defer to the fact finder to fairly resolve
conflicts in the testimony, weigh the evidence, and draw reasonable inferences supported
by the evidence.  Williams, 235 S.W.3d at 750.  Our duty as a reviewing
court is to ensure that the evidence presented actually supports a conclusion
that the defendant committed the crime.  Id.

In the jury charge,
the trial court properly instructed the jury that “a person commits an offense
if she intentionally or knowingly, by act, causes to a child, serious bodily
injury.”  See Tex. Penal Code § 22.04(a).  It defined “serious bodily
injury” as “a bodily injury that creates a substantial risk of death or that
causes death, serious permanent disfigurement, or protracted loss or impairment
of the function of any bodily member or organ.”  See id. § 1.07(a)(46). 
It further explained that “a person acts intentionally, or with intent, with
respect to a result of her conduct when it is her conscious objective or desire
to cause the result,” see id. § 6.03(a), and “a person acts
knowingly, or with knowledge, with respect to a result of her conduct when she
is aware that her conduct is reasonably certain to cause the result,” see
id. § 6.03(b).

Appellant does not contest in this case that the
child suffered serious bodily injury, nor does she suggest that even though she
may have caused such injury, she did not possess the requisite mental state for
the offense.  Instead, appellant insists that the evidence was insufficient to
establish that she was the cause of the serious bodily injury to the child.  The
evidence pointing to appellant as the perpetrator was circumstantial in nature,
but it was substantial.  See generally Scillitani v. State, 297 S.W.3d
498, 500 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (explaining that under Gessa
v. State, 820 S.W.2d 154, 158 (Tex. Crim. App. 1991), the same legal
sufficiency standard governs cases proven by circumstantial evidence as cases
proven by direct evidence).

Camden Gothia testified that he met appellant when he
was in his early 30s and she was in her early 20s.  Soon thereafter they began
to live together.  He said that when they first met they “did a lot of
partying,” but when he became ready to stop, she was not ready.  They were
together for several “tumultuous” years, and Gothia finally broke up with
appellant over the partying issue.

In July 2006, Gothia learned that appellant was
pregnant, and he agreed to live with her again.  The child was born on February
1, 2007.  Shortly thereafter, Gothia and appellant got a miniature dachshund
puppy named Shorty.  Gothia said that he never saw Shorty attack or growl at
anyone, and Shorty never showed any aggressiveness towards the child.  At the
time the child was injured, Shorty weighed about seven pounds.  

  The child was healthy when born.  Appellant wanted
the child to be circumcised, but Gothia did not.  According to Gothia, the
couple had “robust” conversations over this dispute and nothing had been settled
by the time the child was injured.  He further suggested that appellant
probably resented receiving input on the matter from Gothia’s sister, Patches
Deshazo.  The evidence revealed that a doctor’s referral for a circumcision was
issued, and shortly thereafter, a doctor’s appointment for the child was
cancelled; however, Gothia did not recall whether the appointment had anything
to do with circumcision.

Gothia further testified that on March 12, 2007, after
he got home from work around 5 or 6 p.m., appellant told him that she and her
friend, Tressa Shanley, were taking the child to Wal-Mart.  Although the trip
was supposed to be a short one, they were gone for more than four hours.  When
they arrived back at the apartment, appellant did not appear sober.  Gothia said
that he probably yelled at her but conversation was pointless with her in that
condition.

The next morning, March 13, Gothia said that
appellant was sober and she went to get methadone from a treatment center
before he left for work.  After she returned, Gothia told her that they needed
to have a serious talk when he got home and that the previous night was “the
final straw.”  When he left for work, she slammed and then locked the door. 
During the day, Gothia called appellant on the couple’s cell phone multiple
times but did not get an answer until his final call at 3:53 p.m.  Appellant
was upset when she answered and told Gothia that he needed to get home because
Shorty, the dog, had bitten the child.  According to Gothia, appellant sounded
intoxicated and was “slobbering and crying.”  He headed home immediately.

When he arrived, appellant and an animal control
officer were at the apartment.  Appellant told him that everything was going to
be fine and that the child was in good hands.  She said that she had come back
home because there was nothing she could do at the hospital.  When Gothia went
into the bedroom, he saw a lot of blood on the bed and collapsed to the
ground.  By the time he left for the hospital, appellant was sleeping on the
couch.  Later, appellant returned to the hospital but was not there when the
child came out of surgery.  The last time Gothia talked to appellant was in a
telephone conversation in which she said, “I know I fucked up.  You don’t have
to bury me.”  Gothia said the child was in the hospital for six to eight weeks.

Thomas Henry, a maintenance supervisor at the
apartments where the couple lived, testified that on the morning of March 13, 2007,
he heard a child crying loudly from appellant’s apartment.  He then later saw
appellant and a resident named Adam walking together toward Adam’s apartment,
but they did not have a child with them.

Edward Vega, another resident of the apartment
complex, testified that before noon on March 13, 2007, appellant knocked on his
door and said something was wrong with her child.  Appellant appeared
disoriented but was not crying.  Edward called 9-1-1 while appellant and
Edward’s wife, Rita, went to appellant’s apartment.  When Edward entered the
apartment, he saw the child near the end of the bed with “part of his bottom”
and “[h]is genital area . . . gone.”  Edward grabbed a nearby diaper that
appeared to be clean and applied pressure with it to the wound.  The child was
turning blue and was not moving or making any sounds.  Except for a puddle of
blood near one leg of the child, Edward did not see any other blood in the area
of the bed and did not see any paw or hand prints.

Edward asked appellant what had happened, and she
responded that “the dog had done it.”  Edward was with the child until the
paramedics arrived, and at no point did appellant come into the bedroom where
the child was.  Edward testified on direct examination that he did not see
appellant shed any tears, but on cross-examination he acknowledged saying in
his 9-1-1 call that appellant was crying.  Rita told appellant to go with the
ambulance.  After appellant and the paramedics left, Edward saw hot water
running in the sink.  He looked at the dog and did not see any blood on it.  He
also did not see any blood on the floor of the apartment or on the patio where
the dog was when they arrived at the apartment.

Rita Vega provided similar testimony to that of her
husband.  She said that when she first went into the bedroom to check on the child,
appellant was in the living room “hunting a cigarette.”  When the paramedics got
into the ambulance with the child, appellant did not follow until Rita told her
to do so.  After they left, Rita noticed that the garbage disposal was on in
the kitchen and hot water was running in the sink.  She examined Shorty “real
good”; he was not behaving aggressively or strangely and had no blood on him.  Later
that day, Rita saw appellant, Gothia, and a lady from animal control at the
apartment.  Rita asked appellant why she was home, and appellant said the
hospital told her that she could go home.  Still later, Rita saw appellant at
the apartment complex carrying a tall can of beer.  When asked about it,
appellant said, “My nerves is all upset.  I need it.”  She described appellant
at various times as shaking but not crying.

Richard Ponce, a City of Houston paramedic, testified
that he responded to the call to appellant’s apartment.  Ponce found the child on
the bed with a portion of his thighs and his entire genital area removed.  When
Ponce touched the child, the child began to cry.  Ponce immediately wrapped the
child in a trauma blanket and carried him to the ambulance.  Appellant rode in
the ambulance to the hospital.  Ponce said that she appeared hysterical during
transport but did not cry and only touched the child briefly one time.  When he
asked her what had happened, “she just kept stating that the dog had eaten
him.”  She said that when she woke up from sleeping on the couch, the dog was
licking the child “down there.”  Ponce further testified that he did not see
blood in the apartment except on the bed.

Ponce’s partner on the day in question, Dean
Zalesnik, testified similarly to Ponce in several respects and added that the
edges of the injury looked straight and “[v]ery clean . . . like lacerations.” 
He explained that when flesh is cut with a sharp object, the edges of the cut
will be straight.

Tressa Shanley testified that at the time of trial
she was in jail for possession of a controlled substance but she had not been
promised anything in return for her testimony.  Shanley explained that on March
12, 2007, she and appellant went to purchase cocaine from Shanley’s
brother-in-law after having misled Gothia into thinking they were going
shopping.  Shanley further described how later that day she saw appellant take
Xanax pills and inject herself with liquid cocaine.  According to Shanley,
appellant injected the cocaine while in a restroom with the child in his
carrier on the restroom floor.  Shanley also described other times during that
day when appellant went into a restroom with a bag that contained cocaine and
then came out after 30 to 45 minutes, “very hyper and awake.”

On March 13, 2007, Shanley drove appellant home from
the hospital after appellant called her.  Shanley described appellant as “very
spaced-out looking,” and appellant said that she had left the child alone for
about five minutes when the dog jumped on the bed and bit him on his genitals. 
Appellant further said that “there was blood all over.”  Shanley noticed during
the ride that appellant had needle marks on her arm.

Adam Windsor testified that he lived at the same
apartment complex as appellant.  In the morning of a day in March 2007, on
which he later observed an ambulance at the apartment complex, he was outside
smoking when appellant approached him and asked for a cigarette.  He said that
she was wearing flannel pajamas despite the heat and appeared “like she was on
speed . . . very jittery, very jumpy.”  She did not have a child with her.

Dr. Elizabeth Jones is an emergency room physician
who treated the child upon arrival at the hospital.  She described his injuries
and the treatment provided upon admission.  She said that the paramedics told
her that a dog had reportedly bitten the child’s genitalia off, but the wound
did not appear to be a dog bite to her.  She explained that the edges of the
wound were “very straight” and that there was no scallop pattern, as teeth would
tend to make, or bruising, as she would expect to see from a bite.  She further
noted that there were no stray puncture wounds in the area.  Jones concluded
that a sharp instrument had caused the injury.  Jones said that when she told
appellant about the child’s injuries and need for surgery, appellant asked how
long the surgery would last because “she had some things to do at home.” 
According to Jones, the injury suffered by the child created a substantial risk
of death and would result in permanent disfigurement.

Dorie Crouch, a social worker assigned to the
hospital where the child was taken, testified that appellant told her at the
hospital that she and the child were asleep in bed, and she woke to find the child
whimpering and the dog standing over him.  Crouch described appellant as “being
in shock” and tearful.  Appellant denied using drugs or alcohol.

Ladonya Davis, a City of Houston Animal Control
officer, went to appellant’s apartment to investigate on the afternoon of March
13, 2007.  When Davis arrived, appellant was walking across the parking lot, carrying
a can of beer in a plastic bag.  Appellant explained to Davis that she had been
sleeping on the couch when she heard the child, and when she checked on him,
she found him in a pool of blood beside the dog.  While Davis was at the
apartment, Camden Gothia arrived, rushed into the apartment, and asked what was
going on.  Appellant told him that the child had been bitten by the dog and was
now at the hospital.  Davis said that Gothia went into the bedroom and began
“crying and screaming” and fell to the floor.  He then sat on a mattress in the
dining or kitchen area.  Appellant sat beside him and told him “it was all a
part of growing up.”  Gothia then responded “a child growing up is not a part of
getting his stomach ate out [sic].”[1] 
Davis took possession of Shorty and delivered him to the Houston Bureau of
Animal Regulation and Control (BARC).

            Armando Morin
testified that in 2007, he was an investigator for Child Protective Services. 
He arrived at appellant’s apartment in the evening of March 13, 2007. 
Appellant told him that the child was wearing a diaper when he was attacked by
the dog and that she may have thrown the diaper in a dumpster.  Martin thought
the diaper might be important evidence because it would be torn if the dog had
bitten through it.  He searched through the indicated dumpster but only found
one diaper, which was not of the kind appellant used and had no tears or blood
on it.

            Dr. Kevin Lally,
a pediatric surgeon who operated on the child on March 13, 2007, described the
nature of the child’s injuries and the treatment provided.  In his testimony,
he referenced several photographs, exhibits 40 through 45, taken of the child’s
injury.[2] 
Lally concluded that the child’s injury had been caused by “a large, sharp
instrument,” but he could not say with specificity what kind of instrument it
was.  He did not believe that a dog could have inflicted such an injury because
of the size, straight edges, and square shape of the wound.  He said that he
had seen hundreds of dog bites in his practice.  He further explained that the
child’s injury presented a substantial risk of death and would leave him permanently
disfigured.

            Patches Deshazo,
Camden Gothia’s sister, testified that she went by the apartment a week after
the child’s injury occurred to get some items for the child.  She noticed at
that time that a set of poultry shears was missing from its slot in a butcher
block in the kitchen.  She later saw the shears in the bathroom, informed the
police, and the police retrieved the shears.  DeShazo also testified that
appellant did not look sober when at the hospital on March 13, 2007.

            Dr. David Rundel,
a BARC veterinarian, testified that he examined and observed Shorty beginning
on March 13, 2007.  He did not see any blood on the dog’s teeth, nails, or
coat.  Rundel explained that dog bites typically display a “serrated or . . .
scalloped pattern” because their teeth are curved.  He further stated that dogs
leave a “ripping or tearing type of wound” in a “shred[ed] or very
irregular-type pattern.”  Shown photographs of the child’s injury in this case,
Rundel opined that the wound was not caused by a dog bite because the edges
were “just too precise and straight.”  Stool samples and nail clippings from
Shorty were collected for DNA testing.

Cleva West with the Houston Police Department Crime
Laboratory testified that the stool samples from Shorty tested negative for
human DNA.  One of several sets of nail clippings tested positive for blood,
but the lab was unable to determine with certainty that it came from the child. 
West stated that 1 in 3,000 male Caucasians would be a match for the sample.  She
further testified that a set of knives, a knife block, poultry scissors, a garbage
disposal, and a section of pipe, all of which another witness testified were
collected from appellant’s apartment, tested negative for blood.  Jennifer
Watson, a Department of Public Safety DNA analyst, testified that she retested
the garbage disposal and pipe, and they again tested negative for human blood. 
She opined, however, that running hot water through a garbage disposal and pipe
for over five minutes would probably wash away any blood in them.

Dr. Andrea Stolar, a psychiatrist, explained that
cocaine causes “intense euphoria,” Xanax is disinhibiting, and if you combine
the two, you get unpredictable and potentially aggressive behavior.  There was also
evidence that a urine sample taken from appellant on March 14, 2007, tested
positive for cocaine.

Appellant called only one witness:  Dr. Lore Hoag, a
veterinarian who runs a behavioral medicine clinic for animals.  She testified
that she examined photographs of the child’s injury and of Shorty’s mouth and
did not believe that it was impossible for the dog to have caused the child’s
injuries.   She speculated that the dog could have been exhibiting a feeding
rather than an attacking behavior; thus, it would have used its teeth
differently and could have rendered a straight edge to the sides of the wound. 
She also identified photographs of other dog bite wounds that had “relatively
straight and precise” edges.  On cross-examination, Hoag acknowledged that she
was being paid for her testimony, she does not practice medicine on humans, and
she is not an expert on soft-tissue injuries.

In rebuttal, the State called Dr. Heidi Hottinger, a soft-tissue
veterinary surgeon.  She opined that it was “highly improbable” that a small dog
like Shorty could have inflicted the wound suffered by the child.  She
acknowledged that a dog can cause straight-edged wounds but that it would have
taken a lot of time and particular types of effort.  She also acknowledged that
a dog could be attracted by feces in a diaper. 

Appellant’s defense at trial focused on the
possibility that the dog caused the child’s injuries.  However, there was
little evidence implicating the dog as the culprit.  Appellant told various
people she woke to find the dog standing over or licking the child’s groin
area, but the jury could easily have dismissed these self-serving comments.  A
small amount of blood was found on one set of nail clippings from the dog, but
testing could not verify that it was from the child, and even if it was, such
evidence does not show that the dog played a role in causing the injury. 
Numerous witnesses testified that they did not see blood on the dog shortly
after the injury occurred, and the dog’s feces tested negative for human DNA. 
Several physicians and veterinarians excluded the dog as a possible cause of
the injury, and several instead insisted that a sharp instrument of some sort
caused the injury.  The record therefore supports the jury’s rejection of the
dog as the culprit.

            Evidence
established that appellant was left alone with the child, that she had
quarreled with the child’s father about whether to have the child circumcised,
and that she had taken cocaine and Xanax while having the child in her care the
day before the offense.  Such evidence supports the conclusion that she had
motive and opportunity and may have taken substances that lowered her
inhibitions and led to unpredictable, aggressive behavior.  Numerous witnesses
after the injury occurred observed behavior by appellant which the jury could have
interpreted as uncaring and unconcerned regarding the child’s welfare.  In sum,
there was ample evidence to support the jury’s conclusion that appellant caused
the injuries to the child.  We overrule appellant’s first two issues.

Deadly Weapon

In her third issue, appellant challenges the legal sufficiency
of the evidence to support the jury’s finding that she used a deadly weapon,
specifically an unknown “sharp object,” in committing the offense.  In its
charge, the court defined “deadly weapon” as “anything
manifestly designed, made, or adapted for the purpose of inflicting death or
serious bodily jury; or anything that in the manner of its use or intended use is
capable of causing death or serious bodily injury.”  See Tex.
Penal Code § 1.07(17).

In support of her assertion that the evidence was
insufficient to support the deadly weapon finding, appellant emphasizes that (1)
no weapon or instrument was ever found or specifically identified, (2) there
was no testimony regarding the precise nature of the alleged weapon used, and (3)
there was conflicting testimony regarding what caused the child’s injuries. 
While appellant is correct that the deadly weapon was not specifically
identified or found, neither is a requirement for a deadly weapon finding.  See
Regan v. State, 7 S.W.3d 813, 819-20 (Tex. App.—Houston [14th Dist.] 1999, pet.
ref’d).  Substantial evidence supported the conclusion that something very sharp
inflicted a life-threatening and permanently disfiguring and disabling injury
on the child.  Therefore, the instrument in question, in the manner of its use, was capable of causing death or serious bodily
injury as required for a deadly weapon finding.  See Tex. Penal
Code § 1.07(17).

The evidence included testimony from the doctors who
treated the child’s injuries and opined regarding the severity of the injuries
as well as the sharpness of the instrument that caused the injuries.  The
evidence also included photographs of the child’s injuries, which showed rather
straight cuts in the skin.  While appellant’s expert opined that a dog may have
caused the injuries, this possibility was disputed by several of the State’s
witnesses, and the jury was entitled to resolve any such conflict in the
evidence.  See Williams v. State, 301 S.W.3d 675, 684 (Tex. Crim. App.
2009).  The evidence was sufficient to support the jury’s deadly weapon
finding.  We overrule appellant’s third issue.

Photographs

In her fourth issue, appellant contends that the
trial court erred in admitting into evidence seven photographs, six of the
child’s injuries (exhibits 41 through 46) and one taken at the crime scene
(exhibit 61).  Appellant specifically contends that the photographs were unduly
inflammatory and duplicative.  Under Texas Rule of Evidence 403, a photograph is
admissible if it has probative value and that probative value is not substantially
outweighed by the photograph’s inflammatory nature.  Tex. R. Evid. 403; Williams,
301 S.W.3d at 690.  “Rule 403 favors the admission of relevant evidence and
carries a presumption that relevant evidence will be more probative than
prejudicial.”  Shuffield v. State, 189 S.W.3d 782, 787 (Tex. Crim. App.
2006).  Analysis under the rule should generally consider:  (1) how probative
the evidence is, (2) the potential of the evidence to impress the jury in some
irrational, but nevertheless indelible way, (3) the time the proponent needs to
develop the evidence; and (4) the proponent’s need for the evidence.   Id.

A variety of factors may be relevant in determining
whether the probative value of photographs is substantially outweighed by the
danger of unfair prejudice, including:  the number of photographs offered,
their gruesomeness, their detail, their size, whether they are in color or
black-and-white, whether they are close-up images, whether the body depicted is
clothed or naked, the availability of other means of proof, and other
circumstances unique to the individual case.  Williams, 301 S.W.3d at
690.  The admissibility of photographs over an objection is within the trial
judge’s sound discretion.  Id.

            The seven
photographs at issue here were all in color and 8½” x 11” in size.  Exhibits 41
through 46 showed the child’s injury and were all taken at the hospital.  They
were admitted during the testimony of Dr. Lally, who referenced the photographs
in discussing the nature of the injury and the treatment performed.  He also
referenced the photographs in offering his opinion that the injury had been
caused by “a large, sharp instrument” and not a dog.  He based his opinion on
the size, straight-edges, and square shape of the wound.  The exhibits included
images of different specific areas of the child’s injury and of differing degrees
of closeness, and some were taken at different times.  The child is unclothed
in the photographs.

            As discussed
above, a key issue raised in the case was whether the child’s injury could have
been inflicted by a small dog or whether it was caused by a sharp instrument in
the hands of a person.  The photographs of the child’s injury were particularly
important for the jury in understanding the testimony offered by Dr. Lally and
for forming their own conclusions regarding the cause of the injury.  Although
the photographs depict a gruesome injury, they “portray no more than the
gruesomeness of the injuries inflicted” on the child.  Williams, 301
S.W.3d at 691.  In short, the probative value of the photographs was not substantially
outweighed by their inflammatory nature.  Furthermore, given the varying
subject matter of the individual photographs and their individual use during Lally’s
testimony, the photographs were not unduly duplicative.  See id. at
691-92 (finding trial court did not abuse its discretion in admitting several
photographs depicting injuries of murder victims).  The trial court did not
abuse its discretion in admitting exhibits 41 through 46.

            Exhibit 61 is a
photograph taken at the crime scene, showing a blood stain on a bed sheet.  When
this photograph was offered into evidence, however, appellant’s trial counsel
stated that he had “no objection.”  Any error in admitting this exhibit
was therefore waived.  See Holmes v. State, 248 S.W.3d 194, 201 (Tex.
Crim. App. 2008) (“[A] defendant waives any complaint on appeal concerning the
admissibility of evidence when he affirmatively states, ‘No objection,’ at the
time the evidence is offered . . . .”).  Finding no merit in any of appellant’s
arguments regarding the admission of photographic evidence, we overrule appellant’s
fourth issue.

Hearsay

            In issue six,
appellant contends that the trial court erred in admitting hearsay testimony
from Ladonya Davis.[3] 
Davis was the animal control officer who was present at the apartment complex
when Camden Gothia first arrived on the scene.  She said when Gothia rushed
into the apartment and asked what was going on, appellant told him that the
child had been bitten by the dog and was now at the hospital.  Davis said that
Gothia went into the bedroom and began “crying and screaming” and fell to the
floor.  Gothia then sat on a mattress in the dining or kitchen area.  Appellant
sat beside him and told him “it was all a part of growing up.”  When the
prosecutor then asked Davis how Gothia responded, defense counsel stated a
hearsay objection that was sustained.  In response to the prosecutor’s
questions about Gothia’s demeanor at that point, Davis described him as “very
excited” and “[v]ery upset.”  The prosecutor then again asked Davis how Gothia
responded to appellant’s statement, and defense counsel again objected on
hearsay grounds.  After a discussion at the bench, in which the trial judge
clarified that counsel was objecting to testimony regarding what Gothia said
and not regarding what appellant said, the judge overruled the objection. 
Davis then testified that after appellant’s comment about “growing up,” Gothia
said “a child growing up is not a part of getting his stomach ate out [sic].”

            Hearsay is a
statement, other than one made by the declarant while testifying at a trial or
hearing, offered in evidence to prove the truth of the matter asserted.  Tex.
R. Evid. 801(d).  Hearsay is generally inadmissible unless it fits into a
statutory or rule-based exception.  See Tex. R. Evid. 802.  We review a
trial court’s determination of whether evidence is admissible under an
exception to the hearsay rule for an abuse of discretion.  Wall v. State,
184 S.W.3d 730, 743 (Tex. Crim. App. 2006).  One exception to the rule is
provided for “excited utterances,” which are defined as “statement[s] relating
to a startling event or condition made while the declarant was under the stress
of excitement caused by the event or condition.”  Tex. R. Evid. 803(2); Salazar
v. State, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001).  The reasoning behind
the excited utterance exception is a psychological one:  when a person is in
the instant grip of violent emotion, excitement, or pain, that person
ordinarily loses capacity for the reflection necessary for fabrication, and the
truth will come out.  Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim.
App. 2003).  In other words, the statement is trustworthy because it represents
an event speaking through the person rather than the person speaking about the
event.  Id.; Ricondo v. State, 475 S.W.2d 793, 796 (Tex. Crim.
App. 1971).

In determining whether a hearsay statement is
admissible as an excited utterance, the court may consider as factors the time
elapsed and whether the statement was in response to a question.  Salazar,
38 S.W.3d at 154.  The focus, however, must remain on whether the declarant was
still dominated by the emotions, excitement, fear, or pain of the event at the
time of the statement.  Id.  In short, a reviewing court must determine
whether the statement was made “under such circumstances as would reasonably
show that it resulted from impulse rather than reason and reflection.”  Fowler
v. State, 379 S.W.2d 345, 347 (Tex. Crim. App. 1964).

            Here, even
assuming that the statement in question was hearsay (i.e., an out of
court statement offered to prove the truth of the matter asserted), the State
clearly presented evidence on which the trial judge could conclude that at the
time of making the statement Gothia was dominated by the emotions, excitement,
fear, or pain of a traumatic event:  learning his child was at the hospital
because of a reported dog bite.  Davis testified that Gothia was screaming and
crying and had collapsed to the floor shortly before making the statement.  In
light of this evidence, the trial court did not abuse its discretion in
overruling the hearsay objection.  We overrule issue six.

Allegations of Misconduct

            In her fifth
issue, appellant asserts that the prosecution engaged in a pattern of
misconduct that denied her a fair trial.  Specifically, she alleges that
prosecutors:  (1) violated the motion in limine by introducing evidence of her
prior drug use, (2) improperly sought to elicit hearsay evidence from witness Ladonya
Davis, (3) improperly questioned a witness about appellant’s arrest and about
testimony from a Child Protective Services hearing regarding the child, and (4)
made numerous improper arguments to the jury.

We begin by pointing out that except for the
contentions regarding improper jury argument, appellant provides neither
citations to legal authority nor cogent legal analysis regarding her other
contentions of misconduct.  Therefore, we consider only the contentions
regarding improper argument.    See Tex. R. App. P. 38.1(i).[4]

Jury argument by the State is generally considered
permissible if it falls within one of the following categories: (1) summation
of the evidence adduced at trial; (2) reasonable deductions from that evidence;
(3) answer to argument of defense counsel; and (4) pleas for law enforcement.  Wesbrook
v. State, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000).  Even when an argument
lies outside these approved areas, it will not result in reversal unless, in
light of the record as a whole, it is “extreme or manifestly improper,
violative of a mandatory statute, or injects new facts harmful to the accused
into the trial proceeding.”  Id.  For reversal to be warranted, the
remarks must have constituted a willful and calculated effort to deprive
appellant of a fair and impartial trial.  Id.  In most instances, an
instruction to disregard the remarks will cure the error.  Id.

The preferred method of preserving error on improper
jury argument grounds is to (1) object to the argument in a timely manner, (2)
request an instruction to disregard, and (3) move for mistrial, if the
instruction to disregard seems insufficient.  Cruz v. State, 225 S.W.3d
546, 548 (Tex. Crim. App. 2007).  A request for an instruction to disregard is
essential to the preservation of error only when such an instruction could have
had the intended effect.  Id.  If such instruction would not have been
effective, then error can be preserved by a motion for mistrial.  Id.  A
defendant’s failure to object to a jury argument or to pursue to an adverse
ruling his objection to a jury argument forfeits his right to complain about
the argument on appeal.  Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Crim.
App. 1996).

Here, of the nine alleged instances of improper
argument appellant identifies in her brief, she acknowledges having properly
preserved error on only two.[5] 
The first occurred when the prosecutor described appellant’s trial counsel as
being “very good lawyers [just] doing their jobs” but then said “[i]t’s time,
though, for them to move away so that you can judge her.  It’s time to stop
hiding behind the lawyers.”  Defense counsel objected to these remarks as
“striking at the defendant over the shoulders of her counsel.”  Counsel then
requested the jury be instructed to not consider the comments, and the trial
court did as requested.

The second preserved argument occurred when the
prosecutor was discussing an incident that defense counsel had recounted as
having happened to him.  The prosecutor stated, “It sounds like he relates to [appellant],
which there’s a whole ‘nother story there.”  Defense counsel again objected
that this struck at appellant over her lawyer’s shoulder.  The trial court
sustained the objection and instructed the jury to disregard the comments.  After
the jury was instructed to disregard in each instance, counsel requested a
mistrial, which the court denied.

Assuming that the prosecutor’s comments were in fact
improper, we turn to the question of harm.  As the Court of Criminal Appeals
has explained:

There are three factors to consider when assessing the
impact of the harm arising from jury argument error:  (1) the severity of the
misconduct (the magnitude of the prejudicial effect of the prosecutor’s
remarks); (2) the measures adopted to cure the misconduct (the efficacy of any
cautionary instruction by the judge); and (3) the certainty of conviction
absent the misconduct (the strength of the evidence supporting the conviction).

Berry v. State, 233
S.W.3d 847, 858-59 (Tex. Crim. App. 2007).

            Neither statement
here was egregious.  The first was a rather generic suggestion that appellant
could not hide behind her lawyers, and the second was an aside which was relevant
to nothing in the case.  Neither was likely to have had much of an impact on
the jury.  In light of the nature of the remarks, the trial court’s instruction
to disregard was probably effective to cure the misconduct.  Furthermore, as
described in detail above, the case against appellant, although circumstantial
in nature, was a strong one.  Accordingly, appellant was not harmed by the
prosecutor’s argument.  We overrule the fifth issue.

Assistance of Counsel

            In her seventh
issue, appellant contends that she received ineffective assistance of counsel
because counsel failed to properly object in regards to the admission of a
particular photograph and the State’s allegedly improper jury arguments.  The
Sixth Amendment to the United States Constitution guarantees the right to
reasonably effective assistance of counsel in criminal prosecutions.  U.S. Const.
amend. VI; McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970).  In
reviewing an ineffective assistance claim, an appellate court “must indulge a
strong presumption that counsel’s conduct [fell] within the wide range of
reasonable professional assistance; that is, [appellant] must overcome the
presumption that, under the circumstances, the challenged action might be
considered sound trial strategy.”  Strickland v. Washington, 466 U.S. 668,
689 (1984).

Under the two‑pronged Strickland test, in order
to demonstrate ineffective assistance of counsel, a defendant must first show
that counsel’s performance was deficient, i.e., that his assistance fell
below an objective standard of reasonableness; second, a defendant must
affirmatively prove prejudice by showing a reasonable probability that, but for
counsel’s unprofessional errors, the result of the proceeding would have been
different.  Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

Any allegation of ineffectiveness must be firmly
founded in the record, and the record must affirmatively demonstrate the
alleged ineffectiveness.  Id.  at 813.  Appellant bears the burden of
proving by a preponderance of the evidence that counsel was ineffective.  Id.
 To establish ineffective assistance of counsel based on a failure to preserve
error, an appellant must demonstrate that the trial court would have been found
to have committed harmful error had the issue been preserved for appellate
review.  Alexander v. State, 282 S.W.3d 701, 705 (Tex. App.—Houston
[14th Dist.] 2009, pet. ref’d).  

Appellant first complains that defense counsel failed
to object to photographic exhibit 40.[6] 
Exhibit 40 showed an image of the child’s injury.  It was one of a small group
of photographs used by Dr. Lally to explain the injury, the treatment, and his
conclusion that the injury was caused by use of a sharp instrument and not by a
dog.  As we discussed above under issue four, the trial court did not err in
admitting the rest of this group of photographs into evidence over defense
counsel’s objections.  For the reasons given above, we further conclude that
the court would not have erred in admitting this photograph; thus, a claim of
ineffective assistance cannot be premised on the failure to object to admission
of exhibit 40.   Furthermore, isolated failures to object are typically not
sufficient grounds for a finding of ineffective assistance.  See Green v.
State, 191 S.W.3d 888, 895 (Tex. App.—Houston [14th Dist.] 2006, pet.
ref’d) (citing Ingham v. State, 679 S.W.2d 503, 509 (Tex. Crim. App.
1984)).

Appellant has also identified seven alleged instances
of improper jury argument which were not preserved for appellate review.  We
begin by noting that other than stating generally that the prosecutor’s
statements were “either misstatements or clearly not proper,” appellant
provides no analysis of the individual statements and no explanation as to why
she believes each to have been improper.  Therefore, we do not address them
further.  See Tex. R. App. P. 38.1(i).

Furthermore, appellant has failed to meet her burden
of establishing  that counsel was ineffective.  The seven identified statements,
as well as defense counsel’s and the trial court’s actions in regards to each,
were as follows:

·       
Prosecutor indicated that Camden Gothia testified that he had
cancelled a circumcision appointment for the child.  Defense counsel objected
that this statement was contrary to the record, and the trial court instructed
the jury members that they were the fact-finders and arguments by the lawyers did
not constitute evidence.

·       
Immediately thereafter, the prosecutor stated that a circumcision
appointment had been cancelled “within the last few days” before the child’s
injury occurred.  Counsel again objected that this was outside the record.  The
trial court took no action.

·       
Prosecutor made comments about a CPS worker crawling into a
dumpster looking for the child’s diaper in every trash bag.  Counsel objected
that this was outside the record, and the trial court again instructed the jury
that they were the fact-finders and argument of counsel was not evidence.

·       
Prosecutor stated regarding the case presented by the defense: 
“I don’t think they think it went very well.”  Defense counsel objected to the
prosecutor’s “testifying and putting her own credibility behind her
statements.”  The trial court sustained the objection.

·       
Prosecutor suggested that appellant had to be pushed into the
ambulance with the child.  Counsel objected that there was no evidence of this,
and the court again instructed the jury that they were the fact-finders and the
lawyer’s statements were not evidence.

·       
Prosecutor stated that had she thought a dog had attacked her
child, she “would have thought more than once about throwing that dog up
against the wall . . . but I dare say I wouldn’t have touched that dog.” 
Defense counsel objected that it was improper for the prosecutor “to testify to
what she would do,” and the trial court sustained the objection.

·       
Prosecutor stated that on the day the injury took place, Adam
Windsor saw appellant and thought she looked “wired.”  The prosecutor then
said, “And I bet he knows what wired looks like, don’t you?  I mean, that’s the
kind of people she gravitates to.”  Defense counsel objected that this was
outside of the evidence, and the trial judge said, “Same instruction, ladies
and gentlemen.”

Appellant complains that although defense counsel
objected to each of these purported instances of improper argument, counsel did
not pursue each objection sufficient to preserve any error for appellate
review.  However, as this issue was not developed in proceedings on a motion
for new trial, the record is silent as to why counsel chose not to pursue the
objections further.  On such a silent record, this court can find ineffective
assistance of counsel only if the challenged conduct (here, the failure to
preserve any error) was “so outrageous that no competent attorney would have engaged
in it.”  Goodspeed v. State, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). 
The record reveals that defense counsel made numerous objections and obtained
numerous instructions to the jury during the prosecutor’s closing argument. 
Counsel may have concluded that to push harder than he did would have been
futile and might have drawn unwarranted attention to the prosecutor’s
statements.  See Brennan v. State, 334 S.W.3d 64, 76-77 (Tex.
App.—Dallas 2009, no pet.).  This conduct was not so outrageous that no
competent attorney could have engaged in it.  Consequently, appellant has not
met her burden of demonstrating deficient representation as required under the first
prong of Strickland.  See Thompson v. State, 9 S.W.3d at
812.  We overrule appellant’s seventh issue.

            Having overruled
each of appellant’s issues, we affirm the trial court’s judgment.

 

 








                                                                                    

                                                                        /s/        Martha
Hill Jamison

                                                                                    Justice

 

 

 

Panel consists of Justices Brown, Boyce,
and Jamison.

Publish
— Tex. R. App. P. 47.2(b).









[1]
At trial, this line of questioning was subject to a hearsay objection and will
consequentially be discussed in more detail below.





[2]
These exhibits were objected to on the ground that they were unduly
inflammatory.  They will be discussed in greater detail below.





[3]
We address issue six before issue five because as will be seen, our resolution
of issue six impacts our analysis of issue five.





[4]
Appellant did sufficiently brief her hearsay contention under issue six. 
However, as explained above, there was no error in the admission of the
statement in question; thus, there could be no misconduct in offering that
testimony.





[5]
The seven alleged instances for which appellant
acknowledges that error was not preserved are discussed in more detail below in
regards to appellant’s ineffective assistance of counsel complaint.





[6]
It appears from the record that defense counsel did object at one point to
exhibit 40 but failed to get a specific ruling on that objection and failed to
later renew the objection.